IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDRIA REAL ESTATE EQUITIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> WILLIAM DEPIPPO, <br><br> Defendant. | Case No. <br><br> **COMPLAINT** |

## INTRODUCTION

Alexandria has worked for more than 30 years and invested tens of billions of dollars to become the pioneer of life science real estate—only to have Defendant William DePippo, a former Senior Vice-President in a position of trust—steal the very information that makes Alexandria a marketplace leader. While Alexandria has earned its position as the longest-tenured owner, operator, and developer of collaborative mega campuses for cutting-edge life science companies in the nation's top innovation clusters, the company recently learned that DePippo has undermined those efforts. He evidently did so by theft, perpetrated through devices and accounts that ARE provided DePippo to do his work for Alexandria, as an Alexandria executive. Rather than use those resources for the company's benefit or fulfill his duties as a faithful employee, DePippo plotted to "flip everyone off and go run a company – and do my own thing." And DePippo had evidently put that plan into action as he downloaded substantial volumes of his employer's highly valuable proprietary and confidential documents. DePippo's intentional misconduct—engaged in while still on Alexandria's payroll—represents theft of trade secrets, a breach of his fiduciary duty, and a breach of his confidentiality agreement and employment arrangement with ARE.

## PARTIES

1. Plaintiff Alexandria Real Estate Equities, Inc. ("ARE," "Alexandria," or the "Company") is a Maryland corporation with its principal place of business at 26 North Euclid Avenue, Pasadena, California 91101.

2. Defendant William DePippo is an individual residing in Wrentham, Massachusetts. DePippo served as ARE's Senior Vice President – Real Estate Development – Mid-Atlantic until he was terminated on February 28, 2025.

3. ARE and DePippo are parties to DePippo's Employee Proprietary Information and Inventions Agreement, effective as of April 7, 2014 ("PIIA"). A true and correct copy of the PIIA is attached as **Exhibit A**.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because ARE alleges a cause of action under the federal Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq.*

5. This Court also has supplemental jurisdiction over ARE's state law claims pursuant to 28 U.S.C. § 1367.

6. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists, and the amount in controversy exceeds $75,000.00, exclusive of attorneys' fees and costs.

7. DePippo is subject to personal jurisdiction in this State because he resides and is domiciled in Massachusetts.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions, including the misappropriation of materials as described herein, giving rise to this civil action occurred in this District. In addition, on information and belief, ARE

has suffered and continues to suffer harm in this District.

## FACTUAL BACKGROUND

A.  **DePippo Owes Duties of Confidentiality to Alexandria**

9. DePippo's employment with Alexandria was effective as of April 7, 2014. He was hired as ARE's Senior Director – Construction & Development. In January 2021, he was promoted to Senior Vice President – Real Estate Development – Mid-Atlantic. In that role, he was paid hundreds of thousands of dollars.

10. As Senior Vice President, DePippo oversaw ARE real estate projects primarily across the Maryland and Research Triangle markets.

11. In these roles, DePippo enjoyed access to extensive quantities of Alexandria's confidential and proprietary information, including documents laying out proprietary details of Alexandria's real estate portfolio—including very costly and highly competitive developments and redevelopments—that included all aspects of operational planning from concept to delivery, including very sensitive pricing and budgeting information, operations, tenant negotiations, and leasing, branding, marketing, and other highly sensitive information.

12. DePippo occupied a position of trust and was, in exchange, well compensated.

13. As a condition of his employment, DePippo entered into and signed his PIIA with Alexandria. Alexandria would not have hired DePippo or provided him with access to its confidential and proprietary information had he not executed this agreement.

14. The PIIA obligates DePippo to "hold in strictest confidence and [] not disclose, use, lecture upon or publish any of the Company's Proprietary Information." **Exhibit A**, § 1.1.

15. The PIIA covers confidential information related to ARE's real estate business by defining "Proprietary Information" to include "compilations of technical [and] financial . . .

data, . . . proposals, bids, . . . forecasts, . . . market information developed by the Company, . . . [and] agreements between the Company and any third party." *Id.* § 1.2.

16. The obligations imposed by the PIIA survive termination of DePippo's employment with Alexandria and are perpetual. *Id.* § 13.4.

**B.     DePippo Steals Alexandria's Trade Secrets and Confidential Information**

17. DePippo stole hundreds of documents, including highly proprietary and confidential ARE information, available to him through his ARE-issued laptop and his access to ARE systems.

18. This discovery came to light only weeks ago. In or around February 2025, Alexandria began looking into DePippo's recent activity because his conduct and attitude raised concerns about whether he was attending to his duties as Senior Vice President. Alexandria discovered numerous emails from DePippo expressing animus toward Alexandria and its employees, including an admission by DePippo that he planned "to flip everyone off and go run a company – and do my own thing."

19. An inspection of DePippo's ARE-issued devices and accounts revealed more concerning activity in violation of Company policy and his contractual and legal obligations to ARE.

20. Alexandria has a robust security program—including its Systems Usage Policy and Comprehensive Information Security Program and Procedures—dedicated to protecting the Company's confidential information. The ARE Systems Usage Policy provides that proprietary information "must not be sent to anyone by email and may be transmitted only by [secure file transfer program ("SFTP")] or other Company-controlled encrypted data transfer tool." One such ARE-approved SFTP is ShareFile, which Alexandria employees are permitted to use to transmit confidential ARE documents to third parties as part of their roles and responsibilities. Alexandria

4

provided DePippo with access to ARE's instance of ShareFile only for legitimate ARE business purposes.

21. Despite these explicit restrictions, ARE IT's inspection revealed DePippo had circumvented the Company's security system and used ShareFile to grant himself access to ARE confidential information using his personal email account.

22. On January 13, 2025, DePippo informed a third party that he was "waiting to hear my fa[te] at work" following his reluctance to work in person with his Alexandria coworkers rather than continue working remotely, because "these douche bags [at Alexandria] aren't people I would work with."

23. That night, DePippo accessed ShareFile with his ARE credentials.

24. After logging onto ShareFile, DePippo created a folder titled "FUBAR2025."[1]  He then changed the permissions on the ShareFile folder to allow him to download its contents using a personal Gmail address, BillDe24@gmail.com.  When prompted by ShareFile for the name and employer associated with that email address, he provided the alias "B. Anthony" and listed B. Anthony's employer as the apparently concocted company "FT Vendor."

25. Over the course of approximately one hour, DePippo uploaded hundreds of documents from ARE's share drive to the FUBAR2025 folder.

26. These documents included those containing ARE trade secret and confidential information, including many designated "Confidential and Proprietary" on their face.  Examples include:

---

[1] "FUBAR" is an acronym meaning "Fouled Up Beyond All Recognition," often presented with a vulgarism in place of the first word.  *List of Military Slang Terms*, Wikipedia, https://en.wikipedia.org/wiki/List_of_military_slang_terms#FUBAR (last updated February 8, 2025).

- Detailed plans for cost recovery on particular properties.

- Corporate strategy memos for particular properties and real estate projects.

- Risk analyses, including identification of potential risks relevant to the life sciences real estate business and proposed mitigation efforts.

- Detailed financial documents, including budgets for entire real estate projects, marketing budgets, cash flow summaries, and cost detail for particular real estate projects.

- Draft lease agreements.

- Forms and templates for budget change orders, architect change orders, internal cost coding, new contract requests, and project onboarding instructions.

27. Together these documents comprise a "starter kit" for an individual looking to set up a business that would compete with Alexandria's business.

28. ARE keeps this information secret (including via contracts, electronic firewalls, limited access, and physical safeguards as described below) in part because this information would be highly valuable to an individual starting a competing business. The competitor would not need to invest the time, effort, or resources required to create such planning documents and would have an immediate, substantial head start, as well as the ability to undercut ARE on price, due to the R&D and trial-and-error costs avoided.

29. After several hundred documents had been uploaded to that FUBAR folder, DePippo logged onto ShareFile from the Gmail address to which he had provided access credentials. DePippo then downloaded the contents of the FUBAR2025 folder.

30. There is no record of these files being downloaded to any of DePippo's ARE-issued devices. On information and belief, DePippo surreptitiously downloaded these files to a personal device that has not been returned or made available to ARE for inspection.

31. Following this download, over the next two hours, DePippo uploaded approximately 200 *more* files to the FUBAR2025 folder. DePippo twice more downloaded

6

contents of that folder using the personal Gmail address. There is no record of those additional files being downloaded to any of DePippo's ARE-issued devices and thus, on information and belief, DePippo surreptitiously downloaded these files to one or more personal devices that have not been made returned or made available to ARE for inspection.

32. Upon learning of this activity, representatives from ARE met with DePippo. DePippo conceded, in sum and substance, that it would be "concerning" if he downloaded ARE information using his personal Gmail address and admitted he didn't have a "good answer" for why ARE's forensic inspection showed that he did. When confronted with the fictitious name and employer listed to facilitate his downloads, DePippo did not provide any further information.

33. The trade secret and confidential Alexandria information taken by DePippo derives economic value from not being generally known, and not being readily ascertainable through proper means, by others who may obtain economic value from the disclosure or use of the information. Alexandria does not share its confidential information, including the information taken, to preserve its competitive advantage. With unlawful access to ARE's internal information, strategy, calculations, and specifications, competitors can take advantage of shortcuts and—because they need not do the hard, honest work—can free ride on ARE, charge lower prices, and force ARE to effectively compete against a cheaper version of itself. The trade secret and confidential information DePippo stole can only be accessed (and used) on a need-to-know basis. The information is also protected by password controls and physical security measures such as badge-door access. The information is also protected by non-disclosure agreements with third parties, including customers and potential customers, and through PIIAs like DePippo's. As a result of such measures, this information is not generally known or shared outside of Alexandria, and it has not been disclosed publicly and cannot be readily ascertained by proper means—which

is why DePippo, seeking to misuse Company information, had to orchestrate this theft while he still had access to ARE's information.

34. Prior to its very recent investigation, Alexandria management did not know—and had no reason to suspect—that DePippo was stealing its trade secret and confidential information.

35. In addition to the fact that its confidential information has been stolen and not returned, Alexandria has also been forced to make substantial payments to cybersecurity professionals, and to legal counsel overseeing those cybersecurity professionals, to investigate and ascertain the scope of DePippo's misappropriation.

    **C.    Alexandria Takes Reasonable Steps to Protect Its Trade Secrets and Other Confidential Information and DePippo Expressly Acknowledged Such Measures**

36. Alexandria has at all relevant times taken reasonable measures to protect the trade secrets and other confidential information at issue.

37. Among other measures, Alexandria requires its employees to sign Employee Proprietary Information and Invention Agreements such as the one signed by DePippo. Every Alexandria employee is required to sign such agreements as a condition of their employment. DePippo was no exception. Departing employees are also reminded of their ongoing obligations during exit interviews, where they are required to return all ARE devices, ARE documents, and any other "materials containing or disclosing Proprietary Information, Company Inventions[,] or Third Party Information." *Id.* § 8.

38. All Alexandria employees are also required to sign the ARE Business Integrity Policy annually, which requires that "confidential and/or proprietary information about ARE and its business or operations that a person receives as a result of his or her position with ARE . . . should be held in strict confidence," unless "disclosure of that information is authorized by a duly authorized officer of ARE or legally required." An employee's obligation under the

8

Business Integrity Policy "to treat certain information as confidential does not end when a person subject to this policy leaves ARE."

39. DePippo submitted his most recent acknowledgment that he had reviewed, understood, and agreed to abide by ARE's Business Integrity Policy on May 31, 2024.

40. Alexandria also requires that employees sign its Employee Handbook ("Handbook"). This Handbook is frequently updated and employees are required to acknowledge each new version. The Handbook reinforces that "[a]ll persons accepting employment with Alexandria do so with the understanding that any information pertaining to the Company's activities, both current and future, is to be kept strictly confidential during and after employment with the Company" and that "employees shall not remove from Company premises any documents and/or other information pertaining to the business or prospects of Alexandria without prior, written permission of the Company's Executive Chair, the CEO or the CFO," unless "those documents [are] necessary to the immediate performance of their duties." DePippo had no such permission, and no immediate need for the materials to perform his duties for ARE.

41. DePippo submitted his most recent acknowledgment that he had reviewed, understood, and agreed to abide by ARE's Handbook on April 22, 2024.

42. The Handbook also contains Alexandria's Systems Usage Policy, which sets forth ARE's "security measures intended to protect the confidentiality, integrity, and availability of its information assets and confidential information of its users and clients, and other partners." Alexandria prohibits employees from using their ARE-issued email accounts to "[f]orward[] work-related email messages or confidential information to personal accounts," and requires that "[c]onfidential information . . . only be distributed electronically when such distribution is within the authorized course and scope of an employee's job duties."

43. In October 2024, just months before DePippo's improper downloads, ARE reminded all employees, including DePippo, of the relevant aspects of the Systems Usage Policy, including that "employees shall not load Company data on personal devices." This reminder was provided both in writing and in an all-hands company meeting.

44. Alexandria employees, including DePippo, are barred from transferring Alexandria's trade secret or confidential information to a personal Gmail address.

45. Alexandria's networks are password protected and ARE has strict requirements for the complexity of the password to ensure its security. Alexandria also requires that any device or account containing ARE information, including ARE email accounts, have a password, regardless of whether the device was issued by ARE or purchased by the employee. Alexandria also limits access to its confidential information on its networks on a need-to-know basis; employees are granted access only to the information required for their respective positions.

46. All Company premises require badge access and access to designated areas containing highly confidential and proprietary information is limited to only certain employees.

**COUNT I**
**Misappropriation of Trade Secrets**
**Under the Defend Trade Secrets Act of 2016 (DTSA)**
**(18 U.S.C. § 1832 *et seq.*)**

47. The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

48. ARE owns the above-described trade secrets misappropriated by DePippo as they were developed, and used in, the course of ARE's business. These trade secrets are related to ARE products and services that are used in, and intended for use in, interstate or foreign commerce because ARE offers its products and services across the country, building and developing life science campuses from Massachusetts to California.

49. DePippo misappropriated ARE's trade secrets by acquiring those trade secrets using improper means, namely employing clandestine efforts to transmit ARE's trade secrets to a personal account.

50. This transmission was in breach of DePippo's contractual obligations and obligations as an ARE employee, including DePippo's acknowledged obligations in the PIIA and pursuant to ARE's Business Integrity Policy, Systems Usage Policy, and its employee Handbook.

51. DePippo improperly exfiltrated ARE's proprietary business and financial information that is not generally known or readily ascertainable, and that ARE has expended significant resources to generate and compile. This trade secret, confidential, and proprietary information provides ARE a valuable competitive advantage as a result of secrecy because if competitors could access that information, they could short-cut the process of developing such materials, undercut ARE, and effectively force ARE to compete against itself, and its own proprietary methodology.

52. ARE takes extensive measures to protect and maintain the secrecy of its trade secrets and confidential and proprietary information. These protections include requiring its employees and contractors to sign Proprietary Information and Inventions Agreements, prohibiting removal of any materials containing confidential, proprietary information from its premises except in the pursuit of ARE's business, limiting access to its offices, encrypting forms of electronic storage, and limiting access to its computer systems through a variety of security mechanisms, such as requiring a password.

53. DePippo's improper retention of these trade secrets threatens further misappropriation, because these trade secrets comprise a "starter kit" of information one would need to run a competing business, and DePippo has expressed his intent to "flip everyone off and

go run a company – and do my own thing."

54. As a direct and proximate result of DePippo's misappropriation of ARE's trade secrets and other confidential and proprietary information, ARE has suffered damages, including but not limited to fees it expended in investigating DePippo's misappropriation and the loss of value of its trade secrets. ARE is therefore entitled to monetary damages for its actual losses and for unjust enrichment, and/or a reasonable royalty for DePippo's misappropriation.

55. DePippo's misappropriation was willful and malicious, justifying an award of double damages and reasonable attorneys' fees to ARE.

## COUNT II
### Breach of Contract

56. The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

57. In 2014, DePippo began his employment with Alexandria as Senior Director – Construction & Development.

58. As a condition of his employment, DePippo entered a valid, enforceable Proprietary Information and Invention Agreement, effective April 7, 2014 and governed by California law. *See* **Exhibit A**. This agreement survived termination. *Id.* § 13.4.

59. The PIIA protects ARE's legitimate business interests in protecting its goodwill and confidential and proprietary information, including the information DePippo exfiltrated such as "compilations of technical, financial or other data," "properties," "lists of actual or prospective tenants, customers and clients," "plans, proposals, bids, reports, forecasts, financial information," and "forms regarding . . . budgets and unpublished financial statements." **Exhibit A**, § 1.2.

60. Alexandria has fully performed all its obligations under the PIIA, including by paying DePippo's salary throughout his ARE employment.

61. Under the PIIA, DePippo agreed, among other things, that he would not use or disclose any of the confidential information gained through his work at Alexandria for any purpose. *Id.* § 1.1.

62. Throughout his employment with Alexandria, DePippo gained access to trade secret and confidential information. This information was guarded and protected by Alexandria, including by limiting access to its offices, password protecting its computers, and through execution of PIIAs like the one with DePippo.

63. DePippo improperly exfiltrated ARE's proprietary business and financial information that is not generally known or readily ascertainable, and that ARE has expended significant resources to generate and compile. This trade secret, confidential, and proprietary information provides ARE a valuable competitive advantage as a result of secrecy because if competitors could access that information, they could short-cut the process of developing such materials, undercut ARE, and effectively force ARE to compete against itself, and its own proprietary methodology.

64. DePippo's conduct violated Section 1.1 of his PIIA with Alexandria, in which he agreed not to "disclose, use, lecture upon or publish any of the Company's Proprietary Information [], except as such disclosure, use or publication may be required in connection with [his] work for the Company, or unless the Chief Executive Officer ('CEO') (or one of the co-Chief Executive Officers ('Co-CEOs'), if applicable) of the Company expressly authorizes such in writing." **Exhibit A**, § 1.1.

65. No one at Alexandria, including the CEO or co-CEOs, authorized DePippo to transmit and retain any files in a personal Gmail account, let alone its trade secret and confidential files. *See* **Exhibit A**, § 1.1.

66. DePippo's actions in breach of his contract led to the misappropriation of ARE's trade secret information and are therefore the direct and proximate cause of Alexandria's damages, which include but are not limited to fees it expended in investigating DePippo's misappropriation and the loss of value of its trade secrets.

67. Alexandria is entitled to damages.

## COUNT III
## Breach of Fiduciary Duty

68. The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

69. DePippo owes fiduciary duties of care and loyalty to Alexandria, including the duty to maintain the confidentiality of ARE's documents and information.

70. During his employment at Alexandria, DePippo held a position of trust and confidence as its Senior Vice President. In this role, he was entrusted with confidential information about ARE's business, including but not limited to project proposals, budgets and budget workbooks, tenant lists, and project lists, each of which provided substantial value to Alexandria.

71. While still employed by Alexandria, DePippo willfully breached his fiduciary duties he owed to Alexandria by the acts identified herein, including, without limitation, stealing confidential documents and information to start a business to compete with Alexandria.

72. DePippo's actions in breach of his fiduciary duties led to the misappropriation of ARE's trade secret information and are therefore the direct and proximate cause of Alexandria's damages, which include but are not limited to fees it expended in investigating DePippo's misappropriation and the loss of value of its trade secrets.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Alexandria respectfully requests that the Court award relief as follows:

1. Injunctive relief;[2] and

2. Any other relief as the Court deems just and proper.

---

[2] While DePippo's PIIA contains an arbitration clause, the PIIA states: "Nothing in this Agreement is intended to prevent either the Company or [DePippo] from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration." **Exhibit A**, § 10. ARE reserves the right to seek further relief, including its attorney's fees.

Dated: March 26, 2025                          COOLEY LLP

/s/ *Adam S. Gershenson*
Adam S. Gershenson (BBO #671296)
Kimberley Scimeca (BBO #780962)
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
(617) 937-2300
agershenson@cooley.com
kscimeca@cooley.com

Wendy J. Brenner (*pro hac vice* forthcoming)
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 495-5000
brennerwj@cooley.com

Michael Berkovits (*pro hac vice* forthcoming)
Katherine A. Bechtel (*pro hac vice* forthcoming)
55 Hudson Yards
New York, NY 10001
(212) 479-6000
mberkovits@cooley.com
kbechtel@cooley.com

*Counsel for Alexandria Real Estate Equities, Inc.*

16